

In the United States Court of Federal Claims

No. 23-211
(Filed: May 2, 2024)

```
**************************************
NICHOLAS BASSEN, et al.,              *
                                      *
                Plaintiffs,           *
                                      *
        v.                            *
                                      *
THE UNITED STATES,                    *
                                      *
                Defendant.            *
**************************************
```

*Dale F. Saran*, Finn Law Group, P.A., Olathe, KS, counsel for Plaintiff. With whom were *Brandon Johnson* and *J. Andrew Meyer*.

*Kyle S. Beckrich*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for Defendant. With whom was *Holly K. Bryant*, U.S. Army Legal Services Agency, of counsel.

### OPINION AND ORDER

**DIETZ, Judge.**

The plaintiffs in this class action, current and former members of the United States military, sue the United States for backpay and other relief, alleging that they suffered adverse personnel action by the military due to their COVID-19 vaccination status. Before the Court is the government's motion to dismiss the first amended complaint for lack of subject matter jurisdiction under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") and for failure to state a claim under RCFC 12(b)(6). For the reasons stated below, the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the government's motion.

**I.      BACKGROUND**

On August 24, 2021, Secretary of Defense Lloyd J. Austin III issued a COVID-19 vaccine mandate ("the Mandate"). [ECF 1-2] at 2-3.[1][2] Therein, Secretary Austin "direct[ed] the Secretaries of the Military Departments to immediately begin full vaccination of all members of the Armed Forces under [Department of Defense ('DoD')] authority on active duty or in the

---

[1] The operative complaint is the First Amended Complaint, which was filed on August 4, 2023, and appears on the docket at [ECF 21]. However, because the plaintiffs reference the exhibits attached to the original complaint in the First Amended Complaint, the Court also cites to the exhibits attached to the original complaint, which appears on the docket at [ECF 1].

[2] All page numbers in the parties' filings refer to the page numbers generated by the CM/ECF system.

Ready Reserve, including the National Guard, who are not fully vaccinated against COVID-19." *Id.* at 2. He explained that the "[m]andatory vaccination against COVID-19 will only use COVID-19 vaccines that receive full licensure from the Food and Drug Administration [('FDA')], in accordance with FDA-approved labeling and guidance." *Id.* Following the Secretary's issuance of the Mandate, each branch of the Armed Forces issued its own mandate. *See* [ECF 1-4] (Air Force mandate); [ECF 1-5] (Army mandate); [ECF 1-6] (Marine Corps mandate); [ECF 1-7] (Navy mandate).

On December 27, 2021, Congress enacted the National Defense Authorization Act ("NDAA") for Fiscal Year 2022. Pub. L. No. 117-81 (2021) ("2022 NDAA"). Section 736 of the 2022 NDAA provided that any covered member of the Armed Forces who failed to comply with the Mandate could receive only "an honorable discharge" or "a general discharge under honorable conditions." On December 23, 2022, Congress enacted the NDAA for Fiscal Year 2023. Pub. L. No. 117-263 (2022) ("2023 NDAA"). Section 525 of the 2023 NDAA directed the Secretary of Defense to rescind the Mandate. Shortly thereafter, on January 10, 2023, Secretary Austin rescinded the Mandate. [ECF 1-3]. He stated the following:

> No individuals currently serving in the Armed Forces shall be separated solely on the basis of their refusal to receive the COVID-19 vaccination if they sought an accommodation on religious, administrative, or medical grounds. The Military Departments will update the records of such individuals to remove any adverse actions solely associated with denials of such requests, including letters of reprimand. The Secretaries of the Military Departments will further cease any ongoing reviews of current Service member religious, administrative, or medical accommodation requests solely for exemption from the COVID-19 vaccine or appeals of denials of such requests.

*Id.* at 2. The Secretary further stated:

> For Service members administratively discharged on the sole basis that the Service member failed to obey a lawful order to receive a vaccine for COVID-19, the Department is precluded by law from awarding any characterization less than a general (under honorable conditions) discharge. Former Service members may petition their Military Department's Discharge Review Boards and Boards for Correction of Military or Naval Records to individually request a correction to their personnel records, including records regarding the characterization of their discharge.

*Id.* at 3.

Following Secretary Austin's recission of the Mandate, the DoD issued guidelines for implementing the policy change. For example, on February 24, 2023, the Deputy Secretary of Defense explained that the Secretary's recission of the Mandate "also rendered all DoD

Component policies, directives, and guidance implementing those vaccination mandates as no longer in effect as of January 10, 2023." Def.'s Mot. to Dismiss [ECF 22] at 39. The Deputy Secretary clarified that, except if required for foreign travel or if required under a new immunization mandate, "DoD Component heads and commanders will not require a Service member . . . to be vaccinated against COVID-19, nor consider a Service member's COVID-19 immunization status in making deployment, assignment, and other operational decisions . . . ." *Id.* at 40. In addition, each branch of the Armed Forces issued its own directive for implementing the rescission. *See id.* at 41-45 (Army directive); *id.* at 47-49 (Air Force directive); *id.* at 50-51 (Navy directive).

On February 13, 2023, six named plaintiffs filed the instant class action. Class Action Compl. [ECF 1]. On June 13, 2023, the government moved to dismiss the complaint under RCFC 12(b)(1) and 12(b)(6). [ECF 11]. Thereafter, the plaintiffs filed a first amended complaint, adding four additional plaintiffs. First Am. Class Action Compl. [ECF 21]. The ten named plaintiffs are Nick Bassen, Brent Chisholm, Isaac Dailey, Kyle Davis, Billie Endress, Allen Hall, Andrew Merjil, Paul Rodriguez, Hunger Springer, and Derrick Wynne. *Id.* at 1. These individuals are both active-duty service members and reservists in the Army, Air Force, and Marine Corps. *Id.* ¶¶ 16-25.

The plaintiffs assert five counts in their first amended complaint: (1) Violation of the 2023 NDAA, [ECF 21] ¶¶ 171-94; (2) Violation of 10 U.S.C. § 1107a, *id.* ¶¶ 195-223; (3) Violation of the Religious Freedom Restoration Act ("RFRA"), *id.* ¶¶ 224-38; (4) Illegal Exaction, *id.* ¶¶ 239-45; and (5) Correction of Military Records, *id.* ¶¶ 246-49. In addition to class certification, they seek a minimum of $2.2 million in damages as well as reinstatement, correction of military records, and other appropriate relief. *Id.* ¶¶ 250-57. On August 25, 2023, the government filed the instant motion to dismiss the plaintiffs' amended complaint under RCFC 12(b)(1) and 12(b)(6), arguing that the Court lacks subject matter jurisdiction over the plaintiffs' claims and that the plaintiffs fail to state claims upon which relief may be granted.[3] [ECF 22]. The government's motion is fully briefed, and the Court held oral argument on March 6, 2024.

## II.    LEGAL STANDARDS OF REVIEW

When the government moves to dismiss a complaint under Rule 12(b)(1), the plaintiff bears the burden of establishing subject-matter jurisdiction by a preponderance of the evidence. *Tolliver Grp., Inc. v. United States*, 20 F.4th 771, 775 (Fed. Cir. 2021). When considering such a motion, "this Court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor." *Cal. Dep't of Water Res. v. United States*, 128 Fed. Cl. 603, 609 (2016) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)). However, the "court accepts only uncontroverted factual allegations as true for purposes of the motion." *U.S. Enrichment Corp. v. United States*, 121 Fed. Cl. 532, 534 (2015) (quoting *Banks v. United States*, 741 F.3d 1268, 1277 (Fed. Cir. 2014)). "[D]isputed facts outside the pleadings are subject to the fact finding of the court." *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1355 (Fed. Cir. 2011). "Whether the court possesses jurisdiction to decide the merits of a case is a

---

[3] The Court need not address the arguments made in the government's June 13, 2023, motion to dismiss, as it predates the filing of the operative complaint, the First Amended Complaint.

threshold matter." *Sandstone Assocs., Inc. v. United States*, 146 Fed. Cl. 109, 112 (2019) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998)). Thus, if the Court determines that it lacks subject-matter jurisdiction, it must dismiss the case. RCFC 12(h)(3); *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.*; *see also Twombly*, 550 U.S. at 555 (requiring a pleading to offer "more than labels and conclusions"). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Rather, a plaintiff must plead sufficient factual matter to "raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555.

### III.   DISCUSSION

The government moves to dismiss each of the plaintiffs' five counts under either RCFC 12(b)(1) or 12(b)(6). [ECF 22] at 14-16. For the reasons explained below, the Court concludes that it lacks subject matter jurisdiction over Count I (Violation of the 2023 NDAA); that the plaintiffs have sufficiently stated a Military Pay Act ("MPA") claim under Count II (Violation of 10 U.S.C. § 1107a); that Messrs. Chisholm, Hall, and Rodriguez have sufficiently stated an MPA claim and Messrs. Springer, Dailey, Endress, Merjil, Bassen, Davis, and Wynne have failed to state a claim under Count III (Violation of the RFRA); and that all plaintiffs have failed to state a claim under Counts IV (Illegal Exaction) and V (Correction of Military Records).

### A.   Count I – Violation of § 525 of the 2023 NDAA

In Count I, the plaintiffs claim that the government violated § 525 of the 2023 NDAA by refusing to provide them with backpay following the rescission of the Mandate. [ECF 21] ¶¶ 192, 194. The government argues that, under the Tucker Act, the Court lacks jurisdiction over Count I because § 525 is not money-mandating. [ECF 22] at 18. Alternatively, the government argues that even if the statute is money-mandating, the plaintiffs fail to state a claim because § 525 does not apply retroactively and the government denied the plaintiffs pay before the 2023 NDAA was enacted. *Id.* at 21. The plaintiffs argue that the Court should not read § 525 in a vacuum and that, when read with other laws, it qualifies as money-mandating. Pls.' Resp. [ECF 23] at 9-11. As explained below, the Court finds that it lacks jurisdiction over Count I because § 525 is not money-mandating.

Under the Tucker Act, 28 U.S.C. § 1491, this Court has jurisdiction over claims against the United States for money damages "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." *Adair v. United States*, 497 F.3d 1244, 1250 (Fed. Cir. 2007) (citing *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003)). "Thus, the Tucker Act does not create any

substantive right enforceable against the United States for money damages, but merely confers jurisdiction when such a right is conferred elsewhere." *Id.* "When the source of such alleged right is a statute, it can only support jurisdiction if it qualifies, as most statutes do not, as money-mandating." *Id.* at 1250 (citing *White Mountain Apache Tribe*, 537 U.S. at 473). To prove that a statute is money-mandating, a plaintiff must show that the independent source of substantive law relied upon "'can fairly be interpreted as mandating compensation by the Federal Government.'" *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009) (quoting *United States v. Testan*, 424 U.S. 392, 400 (1976)).

Here, because the source of the alleged right is a statute, the Court begins by examining the statutory language at issue. *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980) ("We begin with the familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive."). Section 525 of the 2023 NDAA provides as follows:

> Not later than 30 days after the date of the enactment of this Act, the Secretary of Defense shall rescind the mandate that members of the Armed Forces be vaccinated against COVID-19 pursuant to the memorandum dated August 24, 2021, regarding "Mandatory Coronavirus Disease 2019 Vaccination of Department of Defense Service Members."

There is nothing in the plain language of § 525 that can fairly be interpreted as mandating the payment of money. Nevertheless, the plaintiffs suggest that it can be viewed as money-mandating when viewed in conjunction with other statutes and regulations: "The 2023 NDAA Rescission, in conjunction with the 2023 Appropriations Act, the [MPA] and other applicable federal laws and regulations on which Plaintiffs rely, . . . [can] fairly [be] interpreted as a 'money-mandating' source of federal law . . . ." [ECF 23] at 9. According to the plaintiffs, "[t]his Court has routinely found provisions of previous NDAAs and other money-authorizing or appropriations statutes to be 'money mandating' where there was a separate source of federal law for determining the standards, amounts and conditions for Payment." *Id.* at 10. In support of their position, the plaintiffs cite *Collins v. United States*, 101 Fed. Cl. 435 (2011), arguing that in that case, "this Court held the NDAA provisions that repealed—not *rescinded*, but only repealed— the unconstitutional 'Don't Ask, Don't Tell' policy were money-mandating in conjunction with the Separation Pay Statute, 10 U.S.C. § 1174, which Plaintiffs here have identified as a money-mandating statute." *Id.* (emphasis in original).

The Court is not persuaded by this argument. In *Collins*, the issue before the court was whether 10 U.S.C. § 1174, which Congress amended, via the 1991 NDAA, to extend the "eligibility to receive separation pay to regular enlisted personnel who had served at least six, but less than twenty, years in the active service of one of the military branches," was money-mandating. 101 Fed. Cl. at 443. Significantly, the court first noted that the plain language of § 1174 stated that qualified personnel were "entitled" to payment. *Id.* at 449. The court then found that § 1174 was money-mandating because it and its accompanying regulations (1) provided clear payment standards, *id.* at 458; (2) identified three precise payment amounts, *id.* at 458-59;

and (3) compelled payment in certain situations despite the Secretary of Defense's discretionary authority to withhold payment, *id.* at 459. Unlike the 1991 NDAA in *Collins*, which amended service member entitlements to separation pay under § 1174, § 525 does not amend a pay statute or otherwise entitle service members to monetary compensation; therefore, *Collins* is distinguishable from the case at bar.

Further, the Court is not persuaded by the three additional cases the plaintiffs cite in support of their contention that § 525 is money-mandating. [ECF 23] at 10 n.2. Each of these cases is also distinguishable. First, plaintiffs cite *Striplin v. United States*, 100 Fed. Cl. 493, 500-01 (2011), for the proposition that "NDAA provisions [can] be money-mandating where they establish[] conditions for waiver of pay limitations." [ECF 23] at 10 n.2. However, the court's holding in *Striplin* is not as broad as the plaintiffs suggest. In *Striplin*, the relevant NDAA provision states that "the head of an executive agency may waive . . . the limitation established in [5 U.S.C. § 5547] for total compensation (including limitations on the aggregate of basic pay and premium pay payable in a calendar year) of an employee who performs work while in an overseas location that is in the area of responsibility of the commander of the United States Central Command, in direct support of or directly related to a military operation." 100 Fed. Cl. at 500 n.10 (quoting NDAA for Fiscal Year 2006, Pub. L. 109-163, § 1105, 119 Stat. 3136, 3450-51 (2006)). The court ultimately held that the plaintiff identified a money-mandating source of law for his claim that the Army failed to pay him the full amount of the authorized adjusted pay. *Id*. at 500. The court explained that, while the NDAA provision provides the agency with discretion to waive the pay limitation, the Army had exercised such discretion by establishing detailed criteria to determine whether an employee is eligible for the increased pay limitation. *Id*. at 501. Thus, the court stated that "[a]lthough authority to determine when employees meet the 'eligibility criteria' is delegated [to various military officials and is therefore discretionary] . . . , there is no indication that these officials can deny this increase in pay if the 'eligibility criteria' are met." *Id*. Therefore, the reason the court determined that the provision was money-mandating was because, after DoD officials exercised their discretionary authority and identified eligibility criteria, the provision at issue mandated the payment of monies to eligible individuals. *Id.* The instant case is distinguishable because § 525 does not expressly relate to the compensation of service members. It merely requires the Secretary to rescind the Mandate.

Next, the plaintiffs cite *San Antonio Housing Authority v. United States*, 143 Fed. Cl. 425, 475-76 (2019), for the proposition that "appropriations are money-mandating where [a] separate statute prohibited diminution in funding to specific group." [ECF 23] at 10 n.2. In *San Antonio Housing Authority*, a public housing agency asserted three bases of jurisdiction in its suit against the government for money damages—breach of contract and violation of two appropriation acts. 143 Fed. Cl. at 433. Plaintiffs cite a portion of the opinion in which the court held that a section of a particular statute is money-mandating because it "imposes a specific obligation on the Government." *Id.* at 475. The court explained that the statute imposed a specific obligation on the government because it "states that federal funding received by [the] agency '<u>shall</u> not be diminished' by the government because of the [] agency's participation in the [] program." *Id.* (emphasis added in *San Antonio Hous. Auth.*). In the instant case, there is no language in § 525 that similarly imposes an obligation on the government not to diminish compensation received by service members.

6

Lastly, the plaintiffs cite *Lummi Tribe of Lummi v. United States*, 99 Fed. Cl. 584, 603-04 (2011), arguing that in that case, the court held that a "statute providing grants to specific Indian tribes was money-mandating." [ECF 23] at 10 n.2. In *Lummi Tribe of Lummi*, as in *San Antonio Housing Authority*, the court identified language in the statute that mandated the payment of money to the plaintiff. *Id.* at 594. Specifically, the court held that the statute, which provided that the Secretary of Housing and Urban Development "'*shall* . . . make grants' and '*shall* allocate any amounts' among Indian tribes that comply with certain requirements," was money-mandating. *Id.* (emphases and omission in original). Section 525, however, does not contain any language mandating the payment of monies to individuals who, like the plaintiffs, suffered adverse personnel action by their respective branches of the Armed Forces because they failed to comply with the Mandate. Therefore, *Lummi Tribe of Lummi* is, like the other two cases, distinguishable.

The Court is similarly unpersuaded by the plaintiffs' argument that § 525 is money-mandating because it provides for retroactive relief. According to the plaintiffs, because Congress used the term "rescind," Congress intended that § 525 be retroactive: "Rescission means that the rule is eliminated by the issuing authority, effective as of the issuance date (August 24, 2021), rather than the date the rescission was announced (January 10, 2023); the rescinded rule is thus erased from the rulebook." [ECF 23] at 14. The plaintiffs contend that the restoration of pay and benefits is consistent with "the legislative purpose of restoring pre-Mandate levels of morale, retention, recruiting, and total force strength." *Id.* at 15. In addition, the plaintiffs suggest that because Secretary Austin, in his January 10, 2023, memorandum, ordered that "all separations and discharges resulting solely from non-compliance with the Mandate should be halted and that all adverse personnel actions and paperwork should be corrected," it was clear that Congress intended that the statute be retroactive. *Id.* at 16. The plaintiffs therefore conclude that "[t]he only dispute is whether in ordering the Secretary to provide retroactive relief, Congress meant to categorically deny monetary relief to service members or any specific subset thereof, including those like the Plaintiffs who were the first to be pushed out over it." *Id.*

Generally, "[r]etroactivity is not favored in the law, and congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Hicks v. Merit Sys. Prot. Bd.*, 819 F.3d 1318, 1321-22 (Fed. Cir. 2016) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (internal quotation marks omitted)). Thus, the court must "construe a statute to avoid retroactivity unless there is clear evidence that Congress intended otherwise." *Hicks*, 819 F.3d at 1321; *see also Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994) (stating that a statute does not operate retroactively "absent clear congressional intent favoring such a result"). "Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits." *Landgraf*, 511 U.S. at 272-73, quoted in *Hicks*, 819 F.3d at 1321-22. Here, there is nothing in the language of § 525 to suggest that Congress intended for affected service members to retroactively receive monetary relief. *See Sayers v. Dep't of Veterans Affairs*, 954 F.3d 1370, 1380 (Fed. Cir. 2020) (stating that "[t]he statute plainly lacks an unambiguous directive or express command that the statute is to be applied retroactively") (internal quotation marks omitted). Thus, despite the

plaintiffs' additional arguments,[4] the Court's inquiry must end. *Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1192 (Fed. Cir. 2004), quoted in *Hicks*, 819 F.3d at 1322 ("If the statute is unambiguous, our inquiry is at an end; we must enforce the congressional intent embodied in that plain wording."). In sum, because § 525 is not a money-mandating source of law, the Court lacks jurisdiction over Count I.[5]

### B.   Counts II and III – Claims for Backpay and Other Relief under the MPA

In Counts II and III, the plaintiffs seek backpay and other relief under the MPA. The plaintiffs allege a violation of 10 U.S.C. § 1107a in Count II and a violation of the RFRA in Count III. The government argues that the plaintiffs fail to state claims under the MPA for violations of § 1107a and RFRA. Because the plaintiffs allege entitlements to relief under the MPA in both counts, the Court considers the sufficiency of the plaintiffs' MPA allegations first.

#### 1.   The Plaintiffs' MPA Allegations

The government argues that under the MPA, unpaid back pay is mandatory "in only four circumstances: where a plaintiff '(1) was on active duty, 37 U.S.C. § 204(a)(1) (1988); (2) was a reservist who actually performed full-time duties, *id.* § 204(a)(2); (3) was a reservist on active status who actually performed duties, 37 U.S.C. § 206(a)(1)-(2); or (4) was a reservist on inactive status who would have performed duties but for disability, disease, or illness, 37 U.S.C. § 206(a)(3).'" [ECF 22] at 26-27.[6] According to the government, because only one of the four reservists, Mr. Davis, "alleges facts that he fell into one of these categories," the remaining three reservists do not state claims for which relief may be granted in Counts II and III. *Id.* at 32.

It is undisputed that the MPA is money-mandating.[7] *See Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006) (stating that "the [MPA] has previously been held to be money-

---

[4] The plaintiffs also contend that the presumption against retroactivity does not apply to remedial or curative statutes like § 525, that § 525 applies uniformly to all service members, that the government is judicially estopped from taking a position in this litigation that is contrary to positions it took in previous cases, and that § 525's legislative history supports their position. [ECF 23] at 17-22. None of these arguments, however, addresses the fact that the plain language of § 525 does not express a legislative intent to compensate the plaintiffs monetarily (either prospectively or retroactively).

[5] In response to the government's motion to dismiss, the plaintiffs state that, under Count I, they have stated a claim for relief under the MPA for violation of the 2023 NDAA. [ECF 23] at 8. Even if the Court were to view Count I as seeking backpay and other relief under the MPA for failing to reimburse the plaintiffs their pay and benefits after recission of the Mandate, the complaint fails to state a claim for relief because § 525 does not provide for the retroactive payment of monies. *See Schneiter v. United States*, 159 Fed. Cl. 356, 366 (2022) (stating that "[a] claim that survives a jurisdictional challenge remains subject to dismissal under RCFC 12(b)(6) if it does not provide a basis for the court to grant relief") (citing *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002)).

[6] Reservists include members of the reserve components of the Army, Navy, Marine Corps, Air Force, Coast Guard, and Public Health Service, as well as members of the Army National Guard and Air National Guard. *See* 37 U.S.C. § 101.

[7] Section 204 identifies the types of service members who are entitled to basic pay. 37 U.S.C. § 204. Section 206 identifies the types of service members who are not entitled to basic pay under Section 204 (members of the National Guard or reservists) and defines their pay scale. 37 U.S.C. § 206(a).

mandating"). Regarding the application of the MPA to reservists, "the Federal Circuit has made clear that a reservist can only recover pay under the [MPA] for time on active duty or for drills and training actually performed, regardless of whether he was wrongfully removed from duty." *Kuntz v. United States*, 141 Fed. Cl. 713, 717 (2019) (citing *Palmer v. United States*, 168 F.3d 1310, 1314 (Fed. Cir. 1999)). Thus, "a member who is serving in part-time reserve duty in a pay billet, or was wrongfully removed from one, has no lawful pay claim against the United States for unattended drills or for unperformed training duty." *Palmer*, 168 F.3d at 1314. Conversely, "[i]t is clear that a reservist who alleges that he was unlawfully released from active duty and denied the pay and allowances to which he would have been entitled had he remained on active duty, states a claim under the [MPA]." *Vellanti v. United States*, 119 Fed. Cl. 570, 577 (2015) (citing *Sargisson v. United States*, 913 F.2d 918, 920 (Fed. Cir. 1990)); *see also Radziewicz v. United States*, 167 Fed. Cl. 62, 68 (2023) ("Reservists are able to state a claim for back pay if they were participating in full-time active duties until the government's wrongful action.").

Here, the plaintiffs generally allege that they are entitled to pay because they were serving on active duty when they suffered adverse personnel action:

> Each Plaintiff and each Class Member was "a member of a uniformed service on active duty" when the DoD Mandate was issued up until the time that they were wrongfully discharged, constructively discharged, separated, involuntarily transferred to inactive status, had their orders curtailed, and/or were denied pay and benefits.

[ECF 21] ¶ 197.[8] Next, the plaintiffs specifically allege each plaintiff's entitlement to pay. *See id.* ¶ 16 (alleging that Mr. Bassen "was involuntarily discharged for being 'unvaccinated' prior to the expiration of his enlistment contract"); *id.* ¶ 17 (alleging that Mr. Chisholm, a reservist, "was removed from active status duty"); *id.* ¶ 18 (alleging that Mr. Dailey "was involuntarily discharged for not taking one of the unlicensed ('Emergency Use Authorized' or EUA), mRNA shots prior to the expiration of his enlistment contract"); *id.* ¶ 19 (alleging that Mr. Davis, a reservist, "performed drill periods for which he was not paid"); *id.* ¶ 20 (alleging that Mr. Endress, a reservist, "was removed from theater . . . and from active duty ('REFRAD')"); *id.* ¶ 21 (alleging that Mr. Hall, a reservist, "was on active status in the Air Force Active Guard and Reserve ('AGR') and . . . was dropped from his Title 10 orders"); *id.* ¶ 22 (alleging that Mr. Merjil "was involuntarily discharged for refusing one of the unlicensed, EUA, mRNA shots prior to the expiration of his enlistment contract"); *id.* ¶ 23 (alleging that Mr. Rodriguez "was involuntarily discharged for refusing to take one of the unlicensed, EUA, mRNA shots prior to the expiration of his enlistment contract"); *id.* ¶ 24 (alleging that Mr. Springer "was involuntarily discharged, due to his unvaccinated status and the Mandate, prior to his expiration of his enlistment or contract"); *id.* ¶ 25 (alleging that Mr. Wynne "was involuntarily discharged, due to his unvaccinated status and the Mandate, prior to the expiration of his enlistment or contract").

---

[8] The plaintiffs also allege that, under the constructive service doctrine, they should be awarded payment because they were "'ready, willing, and able' to serve, yet were illegally denied the ability to do so by unconstitutional acts of the President and the Secretary of Defense." [ECF 21] ¶ 218.

These allegations by each plaintiff are sufficient to avoid dismissal for failure to state a claim under RCFC 12(b)(6).[9] [10]

### 2. Count II – Violation of 10 U.S.C. § 1107a

In Count II, the plaintiffs claim entitlement to backpay and other relief under the MPA, arguing that they suffered adverse personnel actions because of "the unlawful order mandating an unlicensed EUA product in violation of 10 U.S.C. § 1107a and express requirements of the Secretary Austin's August 24, 2021[,] Mandate Memo that permitted only FDA-licensed products to be mandated." [ECF 21] ¶ 214. Section 1107a provides in pertinent part as follows:

> In the case of the administration of a product authorized for emergency use . . . the condition . . . designed to ensure that individuals are informed of an option to accept or refuse administration of a product, may be waived only by the President only if the President determines, in writing, that complying with such requirement is not in the interests of national security.

10 U.S.C. § 1107a. According to the plaintiffs, although § 1107a prohibits the military from mandating that service members take an unlicensed EUA product absent presidential authorization, when the Mandate issued, there were no FDA-licensed vaccines available and no presidential authorization of unlicensed vaccines. [ECF 21] ¶¶ 201-203, 207.

The government argues both that the plaintiffs lack standing and fail to state a claim. *Id*. It asserts that "[e]ven accepting as true plaintiffs' allegation that [the military] only had unlicensed EUA vaccines available, nothing in the [M]andate required that plaintiffs receive those unlicensed vaccines." [ECF 22] at 26. Therefore, the government contends that the plaintiffs cannot establish a causal connection between their injuries and the military's conduct. *Id*. For these same reasons, the government avers that the plaintiffs have not stated a claim for relief because they "were permitted to obtain commercially available and fully licensed vaccine

---

[9] The government argues that Messrs. Chisholm, Endress, and Hall—all reservists—do not "allege that they were not paid for any period for any duty they actually performed." [ECF 22] at 33. As noted above, to state a claim as a reservist under either § 204 or § 206 of the MPA, a plaintiff must allege that he (1) actually performed full-time duties, (2) was on active status and actually performed duties, *or* (3) was on inactive status and would have performed duties but for disability, disease, or illness. Here, Messrs. Chisholm, Endress, and Hall each allege that they were serving in an active-duty capacity and had been ordered into full-time federal service when discharged. *See* [ECF 21] ¶¶ 17, 20-21; *see also* [ECF 23] at 31-32. These allegations are sufficient to survive the government's RCFC 12(b)(6) challenge.

[10] The government argues that Messrs. Hall and Rodriguez cannot state a claim for relief under the MPA because they voluntarily separated from the military. *See* [ECF 22] at 33 n. 16 (Hall); *id*. at 31 (Rodriguez). To state a claim for relief under the MPA, "a plaintiff's separation from the military must have been involuntary." *Lopez-Velazquez v. United States*, 85 Fed. Cl. 114, 136 (2008). In the complaint, Mr. Hall alleges that he was "forced to retire," [ECF 21] ¶ 21, due to his vaccination status and Mr. Rodriguez alleges that he was "involuntarily separated," *id*. ¶ 23, due to his vaccination status. While the Court acknowledges the presumption that a plaintiff's separation or resignation was voluntary, *see Lopez-Velaquez*, 85 Fed. Cl. at 136, for the purposes of the government's RCFC 12(b)(6) motion to dismiss, the Court accepts as true the allegations by Mssrs. Hall and Rodriguez that their separations were involuntary.

doses of their choice (which many service members did) to satisfy the requirement" and, therefore, the military's policy "did not violate 10 U.S.C. § 1107a because DoD did not require [unlicensed] vaccines to be taken." *Id*. at 27-28.  The Court finds that the plaintiffs have standing to assert a claim under the MPA for violation of 10 U.S.C. § 1107a and that plaintiffs have adequately stated a claim for relief in Count II.

"[I]n order to invoke federal jurisdiction, a plaintiff has the burden to establish standing under Article III of the Constitution at the time a complaint is filed." *Deeks v. United States*, 2005 WL 6112655, at *4 (Fed. Cl.  Feb. 18, 2005). Although the United States Court of Federal Claims is an Article I court, it "applies the same standing requirements enforced by other federal courts created under Article III." *Stahl v. United States*, 141 Fed. Cl. 396, 402 (2018) (quoting *Weeks Marine, Inc. v. United States,* 575 F.3d 1352, 1359 (Fed. Cir. 2009)). To demonstrate Article III standing, the plaintiff must satisfy three elements: (i) the plaintiff must allege that it has suffered an injury in fact—an invasion of a legally protected interest, (ii) there must be a causal connection between the injury and the conduct complained of, (iii) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1308 (Fed. Cir. 2003). In Count II, each plaintiff alleges that he was a member of a uniformed service on active duty when the Mandate was issued, [ECF 21] ¶ 197, that he suffered adverse personnel action by the military as a result of the unlawful mandating of an unlicensed EUA product in violation of 10 U.S.C. § 1107a and the express requirements of Secretary Austin's August 24, 2021, Mandate Memo, *id*. at ¶¶ 199, 201-214, and that such adverse action caused him monetary harm in the form of lost pay and benefits, *id*. ¶¶ 197. The allegations asserted by plaintiffs in Count II sufficiently demonstrate that they have satisfied Article III's standing requirements.

The plaintiffs' allegations in Count II also adequately state a claim to relief. The plaintiffs claim that complying with the Mandate was impossible because "[n]o FDA-licensed COVID-19 vaccines were available at all at the time that the August 24, 2021 Mandate was issued[.]" [ECF 21] ¶ 207. They further claim that the military unlawfully treated "unlicensed EUA COVID-19 vaccines [as] legally interchange[able] with FDA-licensed vaccines" and required the use of unlicensed EUA vaccines "as if" they were the FDA-licensed product for the purposes of the Mandate. *Id*. ¶ 209. Accepting these allegations as true, the plaintiffs have stated a plausible claim that moves beyond the speculative level. *See Fredericksburg Non-Profit Hous. Corp. v. United States*, 113 Fed. Cl. 244, 253 (2013). These allegations warrant further discovery to understand the circumstances surrounding the military's implementation of the Mandate with respect to each plaintiff and to determine whether, in implementing and enforcing the Mandate, the military adhered to its requirement that only FDA-licensed vaccines be utilized. *See L-3 Commc'ns Integrated Sys., L.P. v. United States*, 79 Fed. Cl. 453, 466 (2007) (stating that "the issue is not whether a plaintiff is likely to prevail ultimately, but whether [it] . . . is entitled to offer evidence to support the claims") (cleaned up).

    3.    *Count III – Violation of the RFRA*

In Count III, the plaintiffs claim entitlement to backpay and other relief under the MPA, arguing that the government violated the RFRA when "[t]he Defendant Agencies each adopted a policy of systematically denying Religious Accommodation Requests ('RAR') using form

letters, without providing 'to the person' individualized determinations required by RFRA, DoDI 1300.17, and the Air Force and Army implementing regulations." [ECF 21] ¶ 231; *id.* ¶ 238. The government argues that because only three of the ten plaintiffs claim that they submitted an RAR, and had their RARs and appeals denied, the remaining seven plaintiffs fail to state a claim under the RFRA. [ECF 22] at 28. The government contends that the seven plaintiffs who did not seek RARs fail to state a RFRA claim because they do not "allege either facts showing the vaccination requirement burdened any sincerely held religious belief when they did not attempt to obtain an accommodation, or facts establishing that it would have burdened them to seek an accommodation." [ECF 26] at 15. The plaintiffs counter that all of the named plaintiffs allege an RFRA claim, whether they filed RARs or not. [ECF 23] at 29. Specifically, they contend that five plaintiffs (Messrs. Chisholm, Endress, Hall, Rodriguez, and Springer) filed RARs,[11] and that although the remaining five plaintiffs (Messrs. Bassen, Dailey, Davis, Merjil, and Wynne) did not file RARs, they chose not to do so because they had other exemptions pending or because they believed that the process was futile. *Id.* at 29-30.

The RFRA states that the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." 42 U.S.C. § 2000bb-1(a)-(b). "If the Government substantially burdens a person's exercise of religion, under the [RFRA] that person is entitled to an exemption from the rule unless the Government demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694-95 (2014) (internal quotation marks omitted); 42 U.S.C. § 2000bb-1(b). The RFRA provides that "[a] person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C.A. § 2000bb-1(c). Additionally, the RFRA does not contain an exhaustion requirement. *See United States Navy SEALs 1-26 v. Biden*, 578 F.Supp.3d 822, 830 (N.D. Tex. 2022) ("If RFRA had an exhaustion requirement, the Court would apply it."). Thus, in order to state a claim under the RFRA, the plaintiffs need not aver that they first filed RARs, that their RARs were denied, and that their subsequent appeals of the RARs were denied. Rather, the plaintiffs must plausibly allege facts showing that the government has substantially burdened their exercise of religion.

Here, Messrs. Chisholm, Hall, and Rodriguez plausibly allege that the government substantially burdened their exercise of religion in its implementation of the Mandate by failing to properly consider their RARs and that such failure resulted in the wrongful denial of pay and other adverse personnel actions. Specifically, each plaintiff alleges that they submitted an RAR and that their RAR was improperly denied. *See* [ECF 21] ¶ 17 (noting that Chisholm's RAR and appeal were denied); *id.* ¶ 21 (noting that Hall's RAR and appeal were denied); *id.* ¶ 23 (noting that Rodriguez's RAR and appeal were denied). Messrs. Hall and Rodriguez further allege that their "RAR[s were] rubber-stamped, that [they] received no individual consideration required under RFRA, that the entire process was a foregone conclusion, and [that they were] forced to participated in that process and expose and defend the sincerity of [their] religious beliefs for what was always going to result in a denial." *Id.* ¶¶ 21, 23. Additionally, the plaintiffs claim that

---

[11] The plaintiffs allege that "five of the Plaintiffs [filed RARs], three of whom had their requests and appeals denied using form letters, while the requests of two others languished for over a year without action." [ECF 23] at 29.

the Armed Forces implemented a "sham" process for religious accommodations, which "resulted in nearly uniform denials of service members requests for religious accommodations, using nearly identical form letters with only names, dates, and titles or duties changed." *Id.* ¶¶ 137, 140. The allegations of Messrs. Chisholm, Hall, and Rodriguez in Count III are sufficient to avoid dismissal under RCFC 12(b)(6). *See Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009) (stating that the complaint is not required "to set out in detail the facts upon which the claim is based").

The remaining plaintiffs—Messrs. Springer, Dailey, Endress, Merjil, Bassen, Davis, and Wynne—fail to plausibly allege that the government substantially burdened their exercise of religion in violation of RFRA or that any such violation resulted in their adverse personnel actions. While it is not necessary for each plaintiff to have filed an RAR to state a claim under the MPA based on an alleged RFRA violation, these plaintiffs fail to make any individual allegations in the complaint regarding their exercise of religion or any burdens placed on such exercise by the government. In response to the government's motion to dismiss, these plaintiffs submitted declarations in support of their RFRA claims. While certain declarations mention religion, *see* Springer Decl. [ECF 23-9] ¶¶ 5-8 (stating that he filed an RAR and that it was denied); Dailey Decl. [ECF 23-3] ¶ 13 (stating that he "did not submit [an RAR] because it was clear that it would be futile and would be denied"); Endress Decl. [ECF 23-5] ¶ 49 ("I started the process of submitting a religious exemption request through my Reserve unit on or around 15 May 2022. I included the required documents, the Chaplain memo, and a personal statement from myself explaining my beliefs and reasoning while including over 15 sources."); *id.* ¶ 50 ("The religious exemption packet would never get approved or disapproved . . . ."); Merjil Decl. [ECF 23-7] ¶ 10 (stating that at a meeting convened by his company commander, "[t]here was no discussion of any religious or medical exemption process . . . just an insistence to get vaccinated"), others do not, *see* Bassen Decl. [ECF 23-1] (no mention of religion); Davis Decl. [ECF 23-4] (no mention of religion); Wynne Decl. [ECF 23-10] (no mention of religion). Nevertheless, the Court cannot consider allegations made in the plaintiffs' response to the government's motion to dismiss, as they are outside the complaint. *See Mendez-Cardenas v. United States*, 88 Fed. Cl. 162, 166-67 (2009) (holding that a response cannot serve to amend the complaint). Therefore, the allegations of Messrs. Springer, Dailey, Endress, Merjil, Bassen, Davis, and Wynne in Count III are insufficient to avoid dismissal under RCFC 12(b)(6).

### C.    Count IV – Illegal Exaction

In Count IV, the plaintiffs claim the following:

> The President and DoD leadership punished Plaintiffs and Class Members through the illegal exaction and recoupment of separations pay, special pays, (re)enlistment bonus payments, post-9/11 GI Bill benefits, costs of training and tuition at military schools or academies and public and private universities, travel and permanent change of station allowances, all of which Plaintiffs were entitled to by law.

[ECF 21] ¶ 243. The government argues that "[p]laintiffs' illegal exaction claims should be dismissed for lack of jurisdiction and failure to state a claim because they fail to allege that any plaintiff actually experienced such exaction or recoupment, and even if they had, that it was illegal." [ECF 22] at 34. The plaintiffs counter that "Bassen has alleged that the Army recouped his enlistment bonus and thereby illegally exacted from him that amount." [ECF 23] at 35 (citing [ECF 21] ¶ 16; Bassen Decl. [ECF 23-1] ¶ 12). The plaintiffs also state that "Davis had $175 taken from him by the Defense Finance and Accounting Service while he was simultaneously prohibited by the government from drilling to earn money to pay for said insurance." [ECF 23] at 35-36 (citing Davis Decl. [ECF 23-4] ¶ 9). The Court dismisses Count IV under RCFC 12(b)(6) for failure to state a claim.

"Case law involving the Tucker Act, 28 U.S.C. § 1491(a), has long distinguished three types of claims against the federal government: contractual claims, illegal-exaction claims, and money-mandating-statute claims." *Boeing Co. v. United States*, 968 F.3d 1371, 1382-83 (Fed. Cir. 2020). The latter two claims, "the non-contractual claims[, . . .] can be divided into two somewhat overlapping classes—those in which the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum; and those demands in which money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." *Id.* (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967) (en banc) (internal quotation marks omitted)). "An illegal exaction occurs when money is improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Christy, Inc. v. United States*, 971 F.3d 1332, 1336 (Fed. Cir. 2020) (internal quotation marks omitted). "Thus, an illegal exaction claim has two elements: 1) that money was taken by the Government; and 2) that the exaction violated a provision of the Constitution, a statute, or a regulation." *Andres v. United States*, 2005 WL 6112616, at *2 (Fed. Cl. July 28, 2005). "[W]hat distinguishes an illegal exaction from a back pay or breach of contract claim, is that in an illegal exaction case the claimant has paid money over to the Government that he once had in his pocket, and in a back pay or breach of contract claim the claimant is seeking payment of money the claimant has never received." *Id.* at *3; *accord Piszel v. United States*, 2015 WL 3654399 (Fed. Cl. June 12, 2015), *aff'd*, 833 F.3d 1366 (Fed. Cir. 2016) ("Because plaintiff cannot show that he has paid any money to the government directly or 'in effect,' he fails to state a plausible illegal exaction claim in the complaint.").

Here, none of the plaintiffs states a claim for illegal exaction because none of them alleges that he is owed monies that he previously paid the government, either directly or in effect. In addition, none of the plaintiffs allege that the government's exaction or withholding of monies violated a Constitutional provision, a statute, or a regulation. Rather, the plaintiffs simply claim that they are owed monies.[12] Lastly, although the plaintiffs note that Messrs. Bassen and

---

[12] *See* [ECF 21] ¶ 16 (Bassen "seeks backpay and other financial compensation of at least $120,000, restoration of medical retirement benefits, correction of records, and cessation of the government's signing bonus recoupment against him."); *id.* ¶ 17 (Chisholm "seeks backpay and other financial compensation in excess of $40,000, retirement benefits in excess of $500,000, restoration of points, correction of records, and any other appropriate relief."); *id.* ¶ 18 (Dailey "seeks backpay and other financial compensation of at least $150,000, restoration of points, correction of records, and any other appropriate relief."); *id.* ¶ 19 (Davis "seeks backpay and other financial compensation in excess of $5,000, restoration of points, correction of records, and other appropriate relief."); *id.* ¶ 20 (Endress "seeks backpay and other financial compensation in excess of $50,000, restoration of points, and any other appropriate relief."); *id.* ¶ 21 (Hall "seeks backpay and other financial compensation in excess of $100,000, restoration of points,

Davis make further allegations in their declarations,[13] as noted above, the Court cannot consider these in ruling on the government's RCFC 12(b)(6) motion to dismiss for failure to state a claim. *See Mendez-Cardenas*, 88 Fed. Cl. at 166-67.

### D. Count V – Correction of Military Records

In Count V, the plaintiffs seek the correction of their military records under 10 U.S.C. § 1552, in conjunction with the MPA and the 2023 NDAA. [ECF 21] ¶¶ 247, 248. Specifically, the plaintiffs a seek a court order directing the correction of their military records and removal of "any adverse paperwork resulting from their unvaccinated status or failure to comply with the Mandate." *Id.* ¶ 248. The government argues that § 1552 is not money-mandating and that the plaintiffs have not otherwise pled a claim "for which plaintiffs could recover damages under the Tucker Act." [ECF 22] at 36. The plaintiffs "clarify that they do not assert a stand-alone claim under Count V and that any relief requested thereunder would be an incident of and collateral to an award of money judgment under Counts I-IV." [ECF 23] at 36. Because the correction of military records is a request for relief rather than a cause of action, the Court dismisses Count V under RCFC 12(b)(6) for failure to state a claim.

## VI. CONCLUSION

For the reasons stated above, the government's motion to dismiss, [ECF 22], is **GRANTED-IN-PART** and **DENIED-IN-PART**. The motion is **GRANTED** with respect to Counts I, III (with respect to Messrs. Springer, Dailey, Endress, Merjil, Bassen, Davis, and Wynne), IV, and V. These claims **SHALL BE DISMISSED WITHOUT PREJUDICE**. The motion is **DENIED** with respect to Counts II and III (with respect to Messrs. Chisholm, Hall, and Rodriguez).

**IT IS SO ORDERED.**

s/ Thompson M. Dietz
THOMPSON M. DIETZ, Judge

---

correction of records, and any other appropriate relief."); *id.* ¶ 22 (Merjil "seeks backpay and other financial compensation of at least $50,000, restoration of points, correction of records, and any other appropriate relief."); *id.* ¶ 23 (Rodriguez "seeks backpay and other financial compensation in excess of $1,000,000, restoration of points, correction of records, and any other appropriate relief."); *id.* ¶ 24 (Springer "seeks back pay and other financial compensation of at least $100,000, restoration of points, correction of records and any other appropriate relief."); *id.* ¶ 25 (Wynne "seeks back pay and other financial compensation of at least $90,000, restoration of points, correction of records, and any other appropriate relief.").

[13] The plaintiffs state that "Bassen has alleged that the Army recouped his enlistment bonus and thereby illegally exacted from him that amount." [ECF 23] at 35 (citing FAC, ¶ 16; Bassen Decl. ¶ 12). The plaintiffs also state that "Davis had $175 taken from him by the Defense Finance and Accounting Service while he was simultaneously prohibited by the government from drilling to earn money to pay for said insurance." [ECF 23] at 35-36 (citing Davis Decl. ¶ 9).